My name is Agnieszka Frischmann and I represent Plaintiffs Bernard and Barbara Schwartzley. I'd like to reserve four minutes for rebuttal if I may. And I guess the first thing I want to bring up is something that I'm sure Mr. Barras will bring up later, which is what our complaint is about. Our complaint does not rest on the oral agreement in December. Our complaint theory is actually very similar to the theory that Mr. Witten has, which is that there's an oral agreement in December, but then it was memorialized in the joint statement, and that the words continue to collect, refer simply to December. I'm having trouble getting my head around your case. Your case rests upon a December 99 agreement that, as I understand it, you're saying was ratified subsequently in the July joint statement. But from what I can see, everything that would lead to the formation of a December agreement can result in an agreement that is devoid of the provisions that you're arguing you have a right to enforce. What we're saying is, what we're trying to enforce is that paragraph 40 in the joint statement, which says that the defendant shall pay Deutsche Marks five billion, and that they shall continue to collect. Let me ask this. From your perspective, who is it that had the authority to bind the banks? The banks were bound by their agent, Manfred Gens, who signed the joint statement, and he had the actual and apparent authority to do that. And in any event, authority is something that you can't decide on a motion to resist. I don't understand December 1999 that Gens said anything. I think what I'd like to say is that December is sort of a red herring. Wait, December is your whole case? No, our theory is the joint. It's a big herring. The interest provision, if you look at our complaint on the section about interest, which is what this case is about, paragraphs 33 to 53, it rests entirely on the joint statement. It appends the joint statement and relies entirely on the text of the joint statement. Our theory is the joint statement tells us what the December 1999 agreement consisted of. Right? Our theory is... And therefore, you're owed money starting with December 1999, not July 2000. Because the joint statement says they shall continue to collect funds on a schedule... Our theory is that in December 1999, they should have started collecting funds, and that interest should have accrued on those funds that would have gone to the foundation. Right. And that they would have turned it over when legal peace was reached. I mean, Judge Ritchie's question is troubling me. Where is there any agreement by a representative of any of the German company defendants effective as of 1999? I think the agreement only comes in when the representatives of the German company defendants sign the joint statement in July 2000. And it comes in, the December date only provides context to the phrase continue to collect. I don't understand that. I understand you to be saying an oral contract was formed as of December 1999. Is that right or not? No. So there was never an oral contract? It was sort of like in the Lichtman case where there was an agreement in principle and then the contract was signed much later. They agreed in principle in December and then there were a lot of other things that were negotiated. But what is the substance, the content of the agreement in principle? We've got the letter from Schroeder where Schroeder writes to Clinton and he talks about their agreeing to the $10 billion figure has now been agreed upon and then he goes on to say in the concluding paragraph are being rejected by the federal government in accordance with the U.S. government. Now how can we find for you without totally ignoring, as some of the submissions here do, totally ignoring that language? He's saying what we had a deal for is $10 billion Deutsche Marks. Anything else as presented in the Horsfeld letter, the plaintiffs yesterday, the attorneys, as he says, presented by the attorneys for the plaintiffs yesterday, but that is the Horsfeld letter, are being rejected by the federal government in accordance with the U.S. agreement. And the other things in the Horsfeld letter were costs of administration, opening the archives, and we agree that that's not in the case. Let's talk about what's in issue, interest. Our position on interest is, I guess I'm not explaining it very well, but when I say your position, I'm trying to figure out where it's coming from, what it's based on. It's based on section 4G in the joint statement. 4G says the German companies shall continue to collect funds on a schedule and in a manner so that at least $100 million. And what we say is the word continue to collect has to refer to some point in time. And in our view, the continue, the obligation began in December. So what they agreed to was to purchase How do we conclude that a contract was fully formed in December 1999? What do we look at? Where's the offer? Where's the acceptance? I think you don't need to hold that in order to uphold our complaint, but I think the offer and acceptance can be found in that Eisenstadt and Lamsdorff were mediators between the two sides. But what did they do and what did they say? One, between Eisenstadt and who was the other one you mentioned? Count Lamsdorff. Well, Lamsdorff could not bind the banks. He was Schroeder's employee, wasn't he? We believe that he was speaking for the entire German team and that he had apparent authority to do that. But I think we don't need to – our complaint doesn't rest on that. And if it feels not clear, I think we should be able to amend. But our complaint really rests on 4G of the joint statement and that the oral – that December date really provides the starting date for which they start collecting. Let's assume it was Schroeder's letter where he said that basically we're not buying Hossfield's – that part of Hossfield's offer. What is there in the record that would suggest an agency relationship between Lamsdorff and the banks in Gewee as opposed to Lamsdorff and Schroeder? And you admit that's a separate entity. Part of the thing here is to get the German government to Antietam. Part of it is to get the German industry that took part in this. I think it's the exchange of correspondence between the sides. There was always one number presented. The German side will put in 2.8 and then it rose. The German side will put in 8. And that was always going to be part of the banks and part of the industry and part of the government. So it was always presented as one number. And if you look at the – You're saying it was a parent agency? Yeah, at least. But I also think it can't be decided on a motion to dismiss. But I think that if you look at the exchange of correspondence – Where does the apparent agency come from? Is there anything in the letter of Lamsdorff that talks about he's obligating the banks? Well, he was obligating the German industry to come up with that amount. But I think you don't need to reach that here to find for us because I think our complaint is very similar to Professor Newborn's in that we also rest on the joint statement that was signed by Manfred Gens of GAFI. When you say there was an agreement in principle as of December 1999, I don't understand what that means. An agreement that there later would be an agreement or an agreement for a specific amount of money? Or what is it that was – An agreement for a specific amount of money. And then – How do we find the specific amount as of December 1999? Well, there was an agreement. Each side would put in 5 billion. I think that's not in dispute. You're saying the transcript was the fruition of that agreement? Yes. But you're saying that it was effective six months earlier? No, we're saying that the joint statement says they'll continue to collect funds. And we're saying what it obligates them to and what they say also is that they obligate themselves to participate in a fundraising campaign. So what we're saying is that means that they were obligated to start collecting funds and that all the interest that accrued on those funds should have gone in accordance with the agreement to the plaintiffs. And that what they did is instead use those funds to make up their principal obligation and then threw in an extra 100 million that they breached the agreement. So all I'm saying is that December date provides the context that what you start looking at is did they accrue interest and give it to the foundation or did they use that interest to make up their principal amount and then add 100 million on top? Isn't it your view that under the July agreement, they were somehow recognized as having been obligated as of six months earlier to start the collection? Yeah, it says continue to collect. I mean, those words have to mean something. And they did start collecting because their press reports say that they had collected significant sums in that interim period and that gave them time to collect the entire amount. And I think that's not in dispute. It's in the record that they did start collecting immediately and that they did start earning interest on the funds immediately. But I think you don't need to reach that necessarily. I would like a minute to get to enforceability because that's going to be dispositive and I have a slightly different, more textual approach. You can add something that Professor Newpoint said? You know, it might not be as... This I've got to see. Maybe that would be a bad idea. But what... And sold its debts. I wanted to talk a little bit back about the presumption in that in all of the cases that have been cited to you, when the presumption has been applied, it's been to treaties that were signed between nations. Forget the presumption. Let's assume that Medellin takes the presumption away, as Professor Newpoint said. And we just look at the language as such type of voice. I thought meticulously it did. How was he wrong? Every one of those textual things is actually wrong. For example, he looked at the title joint statement. 22 CFR 181 actually says the title should not be determinative as to whether or not it will be binding. It was the State Department regulations. He didn't say it was determinative. He said it was one word among many and he cited all of them. And it's consistent. So that's not fair to say he's using it as a magic bullet. He clearly wasn't. But there are at least 12 treaties that are binding in the treaties enforced document with that title joint statement. Maybe so. But that doesn't tell us that this one is enforceable in private lawsuits. No, but in this case what you have is you have the parties signed it. And that's what makes it different than any other treaty. And here you have the plaintiffs who signed it and gave up their lawsuits and the defendants who signed it. We're not talking about who signed it. We're talking about what the words suggest the nature of the agreement is. So Judge Debevoise marches through all the words, some summarized here today by Mr. Whitten. And I thought you just said that on every word he relied on he had it backwards. Well, for example, he relied on parties versus participants. But those are actually synonyms if you look at Merriam-Webster. If you look at – Well, they're not synonyms in the view of the State Department when it's advising people on word selection for agreements. Maybe Merriam-Webster thinks they're exactly equivalent, but the State Department doesn't when it's talking about language choices and agreements like this. Well, and the State Department also says that in a nonbinding document you ought to say that it is nonbinding and not leave it open, which is what this is. This doesn't say whether it's nonbinding or not. And what Debevoise found is really that the United States had espoused these claims. And that's what you find. If you find that something has been committed to diplomatic enforcement, what you've really found is in effect that it's been espoused. Say that again. If you find that – he found that really it was enforceable, but enforceable by the diplomatic process. But there already is a doctrine of espousal. And you can't find espousal light. There already is a doctrine, and that's when the United States takes the claims and resolves them and complements them to diplomacy, like they did in Benazem War and they didn't do that. Could you walk through the words that Judge Debevoise used, as Judge McKee keeps pointing out, and show us how he had it backwards each time? I just find that kind of astounding. It's an understandable argument to say he drew the wrong conclusion at the bottom, even if he was right on the individual word assessments. But to say he had every word assessment backwards just seemed to me almost preposterous. I'm sorry. That was a poor choice of words on my part. Well, you said on each he was wrong. I can go through them one by one. That's what I'm asking you to do. We talked briefly about the joint statement. We talked briefly already about why it doesn't need to have a statement that it is privately enforceable, that that's not required. And, in fact, most of the treaties that the Supreme Court has found are enforceable, don't contain that statement, like the treaty that was enforced in Asakura versus Seattle or the Chu Hong Treaty. We're in Chu Hong. We all agree that no one word, by its presence or its absence, resolves the issue. You have to look at all the pertinent words and try to get a sense of what was going on. For example, he looked at Paragraph 4D to say this contains precatory, not mandatory, language. But we're really limiting our argument to Paragraph 4D, which has mandatory language. It says shall pay and will collect. And it's laughable that treaties are, in fact, severable, that you can take provisions out, like in INS versus STEVIC, where they said Article 33, but not Article 34 of the INS Convention is privately enforceable. Or in the tax case where they said some provisions are privately self-executing and some are not. Or even in Sanchez-Lamas where they said different provisions in the Vienna Convention are perhaps privately enforceable or not, and they compared the language. So it's pretty subtle that you can look at Paragraph 4D and Paragraph 4B differently and separate those out. And he also found that there was no private right of action in the text, but our position is that we're looking for the private right of action in the law of contracts. And just like in Foster versus Nielsen, where the court said— That's kind of a rabbit in the hat, though. You're saying you're looking for private right of action in the law of contracts, but one of the issues is whether or not the law of contracts applies here or if it's a diplomatic document. And our argument is really whether you apply the law of treaty or the law of contract, really they're basically the same. You look to offer an acceptance. You look to the text of the document, and here you have offer and acceptance. You have the parties that signed it. You have that they manifested an intent to be done. In fact, they substantially performed, which would give rise to an enforceable contract. But that wouldn't be in the existing diplomatic agreement. If you had a diplomatic document, which is going to require certain parties to perform, and they perform, you can't look at that and say, ah, they performed. There must be a private right of action. Well, I guess the question is then, does the signatures of the nation states on a document between the plaintiffs and the defendants, does that render it, does that take that out of the realm of enforceability? And our position is that it does not, and that you have a doctrine of espousal. If the United States had wanted to espouse their claims, it would have and could have settled them in that way, and it didn't. I'm not sure. You did reserve some time with me, didn't you? I did. Four minutes, that's fine. Okay, thank you. May it please the Court, Jeffrey Barras, Deutsche Bank, and Dresdner Bank. The Schwarzly complaint pleads a very specific agreement. It pleads an offer of December 13, 1999, by letter of Mr. Hausfeld to Count Lamsdorff, for $10 billion present value emphasis underlined in the complaint. It pleads an acceptance by Secretary Eisenstadt on December 14, and it pleads confirmation of this agreement by letters of December 13 and 14 by President Clinton and German Chancellor Schroeder. Let me ask you about the Eisenstadt letter. How can Eisenstadt accept a suggestion of Mr. Hausfeld on behalf of the German company? He doesn't represent the German company. Of course he doesn't represent the German companies, and the complaint doesn't plead that he represents the German companies. And Count Lamsdorff, the complaint pleads, was the special representative of Chancellor Schroeder. He didn't represent the German companies. Now, this is not Jeffrey Barras imagining that this is the agreement pleaded in the complaint. This is what two highly respected district judges, Judge Bassler and then Judge Debevoise, said was the agreement pleaded in the complaint. And the first answer to the agreement is exactly the one that Chief Judge Michel just raised, which was part of the reason we moved to dismiss as a matter of law. There's no allegation in the complaint that the offer was made to someone with authority to accept for the banks or that the banks even knew of the offer, and there is nothing in the complaint which alleges that the alleged acceptance by Eisenstadt was made by someone with authority. Also, when I look carefully at what Eisenstadt is alleged to have said in a telephone conversation, there's not even a letter at this point, there's a telephone call, and the essence as I read it is that you have a deal which is consistent with the bottom line figure is going to be $10 billion, and present value isn't part of what he says. It's absolutely not present in what he said, and even more fundamentally if we go beyond the documents annexed and should have been annexed to the complaint, but if we go beyond that for a moment to the record, we see that Eisenstadt's declaration is absolutely glaringly absent on this whole alleged correspondence and communication. There's no mention of it either in his book Imperfect Justice. Now, what we do have here, and Judge Debevoise was I think promptly disturbed by this, is the absence from first the complaint with its numerous exhibits, and then from the Housefeld Declaration with its almost 90 exhibits of the Schroeder letter. All right, but this isn't a sanctions case, we're on the merits. On the merits, Judge Debevoise said when you look at this letter, as I think Judge McKee said a few moments ago, it says flat out other terms, other demands as made by plaintiff's lawyers yesterday, that's the date of Housefeld's letter, are rejected out of hand in accordance with the United States government. So what we have here on the record is that looking solely at the documents that were annexed to the complaint and should have been annexed to the complaint, we find that the complaint fails, one, for lack of pleading that anybody with authority to bind the banks either received an offer or accepted an offer. Secondly, that the offer was rejected immediately by the party to whom it was made. The offer was made to the German government and rejected the next day by the German government. And when we also look internally, again looking only at documents annexed to the complaint, we see that the very terms of the agreement were rejected. The agreement proposed by Housefeld in addition to his present value demand, and it was a very firm take this or leave it, this is my final offer kind of statement from a very experienced plaintiff's lawyer, was to the effect of all costs were to be on top of the 10 billion DM.  We know that the joint statement provides for exactly the opposite. All costs, including the attorney's fees paid to Mr. Newborn and to Mr. Housefeld, came out of the 10 billion DM. Do you also rest on subsequent Eisenstat, that is subsequent to December, letters and explanations as to various ways in which he raised interest-related points? I do, Your Honor, as did Judge Bassler initially when he reviewed this. And these are, again, documents annexed to the complaint. In documents annexed to the complaint, you see in February when Eisenstat... It wouldn't make any sense, would it, if in December I've agreed to present value, it wouldn't make any sense for me to be proposing interest-related terms later, because present value would already take care of it. And better, because the best thing you can get in terms of interest is present value on the principal sum agreed to in mid-December. When Eisenstat is seen, according to the complaint, asking for funds to be deposited currently in February and then again in July, he's asking for a lesser remedy. Now, unless Secretary Eisenstat's negotiating tactics were so sophisticated as to demand less instead of more, this makes absolutely no sense, as I believe Judge Mischel just pointed out. What about counsel's argument? I'm not sure it was her theory in her brief, but I understand it to be at least her theory and argument here that the magic words continue to be collected. So we have a July text saying funds to be put up by the German companies, quote, will continue to be collected. So she said that must mean they were already being collected, and she alleges that in fact some of the funds from some of the companies had been collected prior to July 2000, and that therefore that phrase must refer back to some earlier date, and she says the most logical date is December 99. What's your response to that argument? I don't understand it. Funds were being collected not only before July, my understanding is that funds were being collected before December, that this was an ongoing process on the part of the German economy to raise a very considerable amount of money from what ultimately became 6 billion contributors. I think we have to go back to basics. I mean, one of the fundamentals I'd like to go back to is that when you plead a complaint, the defendants are entitled to move to dismiss that complaint and not the one that you make up as you go along the proceedings. There's no question. We're bound by the words of the complaint. You don't need to worry about that. We know what the rules are. The second fundamental I'd like to go back to is that absent an agreement to pay interest on a sum, there is no agreement to pay interest. You do not have to pay interest on something unless you agree to it. And so what we have here is an attempt by the other side here to find that agreement somewhere. The complaint pleads an agreement out of a certain letter and conversation. That has been totally shot apart. What we now have is an attempt to find that agreement in Article 4D of the joint statement. They've now walked away from the agreement that they attempted to plead in the complaint, and they're now attempting to find a new agreement. But in fairness to Ms. Friesland, as I understand her argument, the joint statement is the embodiment of the December agreement. Well, you can't embody an agreement that was never made. Well, I know. That's a different point. My point is if you can't find, if you never made, if there never was a December agreement, then the joint statement can't memorialize it or embody it. So let's put that aside. I don't buy the thing about her switching agreements. Secondly, let's look at the language. Let me just ask this, and this is confusing. The motion for summary judgment that the plaintiff made was based upon the December 1999 agreement, and that as a matter of law entitled them to judgment. But the ruling that Judge Debevoise issued was based upon there not being a right of private enforcement in the joint statement. And was it just that he was confused between the two cases? I don't think so. I think that when you go back to what Judge Debevoise did, he made it very clear, and he twice found that Mr. Hausfeld's contentions that the German companies agreed to pay in December 1999 interest had no basis in the record and were supported only by distortions of the record. And he also found that the, quote, the contention that the German government and German industry accepted Mr. Hausfeld's proposal defies everything in the record. Yeah, but then the answer to the motion is that there is no December 1999 agreement you lose as a matter of law. It's not privately enforceable. I think he did that. This is the reason why I would say you do not even have to reach the question of the conversion, of whether the conversion to summary judgment was appropriate. I think that the reason why, and I'm now going to do a little bit of speculation, the reason why Judge Debevoise found that his holding, which primarily applied to Gross, which was that the joint statement was not enforceable, was something he was also making applicable to Schwarzlee, was that we had down below what we have here, which is that having pled a December 1999 agreement, the Schwarzlee plaintiffs then came in and said, well, we really want to talk about the joint statement. So I think Judge Debevoise, having written a great deal, said, all right, if what you're saying, plaintiffs and Schwarzlee, is that you're relying on the joint statement, you lose for the same reason that the plaintiffs and Gross lose for, which is that the joint statement is not enforceable. And what is more, if you're talking about your December 1999 agreement, at this point I'm going to convert this motion to dismiss, which I submit he did not have to do, to a motion for summary judgment, and I'm going to find that there was no such thing as a December 1999 agreement. I think that's what the court below did. I would, if I could, turn to the language of the joint statement, because, again, I don't believe that the language of the joint statement, Section 4D, can support any of the plaintiffs' theories of interest. I want to make it very clear in terms of one thing that came up and has come up. We are not arguing that the joint statement means that principle means interest. We are arguing that Section 4D means exactly what it says, that we had an obligation to deliver from collected funds 100 million DM, at least, and we did that. The explanation as to where that term came from was given to us, in declarations outside the record. But you do not need the origin of that phrase, which comes from a fight between the plaintiffs for additional money, to come to the conclusion that 100 million DM, at least 100 million DM, means 100 million DM, which is what we paid. What the plaintiffs have done is take 4D, which talks about German funds will continue to be collected, and turn that into obligations that the words cannot hold, cannot support. Certainly, there's an enormous difference between a promise to pay present value on DM 5 billion in December, and an obligation to collect interest on funds as they're being collected. There's also nothing in this language, nothing in the joint statement, that refers to the words 4%. There's not even anything in the voluminous record that shows where the 4% comes from. And indeed, I read with interest in Mr. Newborn's brief, that this case is so embodied with federal interests that federal common law must govern it. Well, if that is the case, why are we suddenly picking a 4% German interest rate to govern? That's not what happened in the Swiss bank cases. There was a specific where Mr. Newborn played an active role. I suppose the answer is, the funds are going to be collected from German companies in Germany, and deposited in banks or other investments in Germany. Therefore, the German Civil Code is the logical foundation line interest rate. And don't you think that there would be something in terms of who that agreement was made with? In all of his voluminous declarations, in all of his many arguments to this court and to the court below, Mr. Newborn has never once identified a single German participant with whom this mythical discussion of 4% was had. He isn't making that argument. He's arguing that it's a default to a German Civil Code minimum interest rate, which is logical for funds that are going to be invested in Germany. With all respect, that's not what he's arguing. He's arguing that there was an agreement made with somebody who we had never identified, embodied in language that supposedly is 4D, that says that the Germans promised to pay 4% for six months. And this is where he says, this is what accounts for the 100 million Deutschmark in interest. With all respect, Your Honor, he's saying this was the agreement, and somehow the language of 4D was constructed to repeat, to embody this. It doesn't say that. And I think, if you will forgive me, I would like to address the six-month point, because I think that the six-month point is actually quite interesting in terms of the way the language here has supposedly evolved. The Berlin Accords do not mention six months or any time period. The six-month working estimate for how long it was going to take to get the cases dismissed does not appear in any working paper coming out of the negotiations. The best that Mr. Newborn can come up with is his own typed written notes dating from August 1999, which he describes in footnote five to his main brief as, quote, a working paper estimating a six-month period to dismiss American cases. In fact, when you look at JA 890, his typed notes states that the steps there thought to be necessary to dismiss the cases will, quote, take at least six months. Now, we've heard a lot from Mr. Newborn in his briefs that at least is not a cap. So, in other words, the only thing that he has to support six months does not say within six months, does not say no longer than. It says at least six months. It's kind of bizarre to think that if what he was doing was writing with some, again, unidentified, never identified German party across the table in interest clause, that it would be based on a six-month provision, which he says in his own notes is going to be at least six months. Mr. Newborn has, in statements to the courts below and in prior arguments to this court, stated that the reason why the six months was blown was that no one expected Judge Cram not to dismiss the bank cases in New York. Will you forgive me? On May, because I was involved in this in a way that is unprecedented in my career. In May of 2000, I was counsel to the banks before Judge Cram. We were called before her special master, Senator Alphonse D'Amato. Your Honor, this is in the record. Yes, Your Honor. This is at the supplemental appendix. This is in the record in this case? Yes. Supplemental appendix 2629. I was called before, we were called before Special Master D'Amato and told point blank, unless the German banks come up with at least several hundred million more dollars, the settlement of what became known as the Austrian Assignment Issue, which is discussed in the mandamus petition that was ultimately granted by the Second Circuit, Judge Cram was not going to dismiss. I then did something that I had never done before and hope never to do again. Before the panel on multidisciplinary. Is everything you're telling us now not testimony here but in the pages in the record that you cite? S.A. 26. It's my letter to the panel on multidistrict litigation. I wrote to the panel on behalf of the German banks, annexing the transcript of Senator D'Amato's conference, advising the panel that because of this we objected to the assignment of the cases to Judge Cram. I have never done anything like that before. I hope I will never do it again. That letter was served on all counsel in all of the cases. So the idea that Judge Cram's dismissal or refusal to dismiss was this lightning strike out of the blue is simply false. Now, Mr. Newborn says now I wasn't before Judge Cram in the Austrian cases. That's correct. He was there as counsel in the bank cases. Whether he saw my letter or not, I don't care. Mr. Hausfeld is on the list of. We should be careful not to let this degenerate into a debate among lawyers. All I'm driving at is one point. And that is? And that point is that there is nothing in the record to support the six-month idea and that there's everything in the record. And I do urge the court to look at the supplemental appendix because everything I said is in there in terms of the supplemental appendix. Okay. Well, we think we understand your argument. Your light's been on for a bit and we're not paying strict attention to it. I'm sorry? Your light's been on for a while. We're not paying strict attention to this, obviously, but I think it would be advisable, Mrs. Friesman, to reserve some time for rebuttal to hear it. Thank you. I feel like I should give Mr. Newborn time to answer, but I want to get out of here in time to see the Phillies game tonight. I'll be really quick. I just wanted to turn to page two of the joint statement, which says affirming the consensus reached by all participants on December 17th, 1999, at the seventh plenary meeting in Berlin. So the joint statement itself in its text refers to the consensus reached in December. My understanding of this argument is what is that? Right. What does that mean? What are the particulars? I'm just saying our complaint isn't completely, like, out to lunch. It's right here in the joint statement. And we're entitled to plead an alternative. If you reject the present value theory, the only agreement we talk about in the whole section on interest in our complaint, in paragraphs 33 to 53, is the joint statement, which is appended and is the sole source of the interest obligation. The next thing that I wanted to mention is the Supreme Court has repeatedly allowed private individuals to enforce treaties that are no less definite than the treaty we have before us. So even if you say it's a treaty and not a contract, they permitted a man to enforce a treaty that was signed between nations that says people shall have three years to sell property in Clark v. Allen. They permitted a Chinese laborer to enforce a treaty that he didn't sign that said shall have the freedom to come and go. And that was in Chu Hong. They permitted a Japanese citizen to enforce the right to open a pawn shop in Seattle in a treaty that wasn't signed by him, but was signed by a treaty of enmity signed between Japan and the United States that said shall have the liberty to carry on trade. Here we have a document that was signed by the private parties and has very specific relationship between those parties and has offer acceptance and considerations. I would submit that this is a different type of treaty than like the International Covenant on Civil and Political Rights or the Geneva Conventions or treaties that are simply signed between nations. It's not generally applicable. Applied to these defendants and these plaintiffs, they gave consideration for it and they signed it. In terms of your enforceability argument, that's probably your best argument. I think Professor Newborn said it. It's almost a bilateral kind of treaty at one level. It's an agreement between nations at another level. It's a specific agreement to give redress to a class of persons and therefore it's not a traditional kind of international covenant. That's probably your best argument. And the Supreme Court has repeatedly held that treaties are in fact severable in this way in INS versus STEVIC and in Sanchez-Lamas and also the Ninth Circuit in the Linus case with regard to the tax treaty. I wanted to return a bit to the preamble that we discussed earlier. I think the preamble where it talks about the establishment of a foundation doesn't create a basis for claims. It clearly refers to claims that may be asserted against German companies arising out of the Nazi socialist era in World War II. So that was intended to say that this foundation agreement closes the door on claims that arise out of the Nazi socialist era. But this suit here doesn't arise out of the Nazi socialist era. It arises out of the contract that we have. And that's all I have. Thank you very much. Thank you. Thank you. Again, a very fascinating and troubling case, obviously. I want to take a minute of your time. I want to thank all the counsel for a very helpful and thorough presentation. Thank you.